NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| RANDOLPH WILLIAMS,<br><br>Appellant,<br><br>v.<br><br>STATE OF ALASKA,<br><br>Appellee. | Court of Appeals No. A-12183<br>Trial Court No. 1HA-12-071 CR<br><br>O P I N I O N<br><br>No. 2594 — March 30, 2018 |

Appeal from the Superior Court, First Judicial District, Haines, Keith B. Levy, Judge.

Appearances: Susan Orlansky, Reeves Amodio LLC, Anchorage, under contract with the Public Defender Agency, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Donald Soderstrom, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge.[*]

Judge MANNHEIMER.

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

Randolph Williams appeals his convictions on eight counts of possessing child pornography. [1]  The pornographic images were discovered on an office computer at the Chilkoot Indian Association in Haines around mid-day on November 19, 2012. This computer was available for the use of Association members, and Williams had used the computer earlier that day, but he claimed that he only used the computer to check his e-mail, and that he did not possess the pornographic images.  The jury rejected this defense and convicted Williams of the eight counts.

In this appeal, Williams raises three claims.

First, Williams argues that the indictment against him should have been dismissed because the State failed to apprise the grand jury of evidence suggesting that Williams might have an alibi for mid-day on November 19th.  We reject this claim because the purported "alibi" evidence merely suggested, and did not come close to proving, that Williams was elsewhere at the relevant times.  It was the kind of evidence that could potentially be useful to a defense attorney, but it did not independently establish Williams's innocence.

Williams's second appellate claim concerns the "last accessed" file property of the pornographic images.

The Windows operating system has the ability to keep track of the date and time at which a computer file was last "accessed", either by a computer user or by a computer program.  At trial, Williams's attorney pointed out that when the Haines chief of police opened the pornographic images on the Association's computer — to confirm the presence of child pornography on the computer, and to preserve this evidence by taking photographs of the images as they were displayed on the computer monitor — he inadvertently altered the "accessed" property of those images.  Williams's attorney

---

[1]  AS 11.61.127(a).

further asserted that if the pre-existing "accessed" date-and-time stamps of the pornographic images had been preserved, those date-and-time stamps would have shown that Williams could not have been the person who downloaded and then deleted the various pornographic images.

Based on these assertions, Williams's attorney asked the trial judge to give a *Thorne* instruction to the jury regarding those "accessed" date-and-time stamps — *i.e.*, an instruction telling the jurors to presume that the earlier "accessed" date-and-time stamps would have been exculpatory if they had been preserved.[2] The trial judge declined to give a *Thorne* instruction. For the reasons explained in this opinion, we uphold that decision.

Finally, Williams argues that even though he has two prior felony convictions, he should have been sentenced as a first felony offender for his present crimes, rather than as a third felony offender, because he was released from supervision for his most recent prior felony more than ten years ago. *See* AS 12.55.145(a). As we explain in this opinion, we agree with Williams, and we direct the superior court to re-sentence him.

Normally, we would address a defendant's attacks on their convictions before we addressed the defendant's attack on their sentence. But in Williams's case, our resolution of his sentencing issue has substantial importance for all defendants who are sentenced for a sexual felony under AS 12.55.125(i). This is why we are publishing our decision in this case — and it is why we address the sentencing issue first, even before we describe the underlying facts of Williams's case.

---

[2]  *See Thorne v. Dept. of Public Safety*, 774 P.2d 1326, 1331-32 (Alaska 1989).

*The question of how many prior felonies Williams had for purposes of presumptive sentencing*

A jury found Williams guilty of eight counts of possessing child pornography. This offense is a class C felony,[3] but because it is a sexual felony, sentencing for this offense is not governed by AS 12.55.125(e) (the sentencing provisions that normally apply to class C felonies). Rather, sentencing for this offense is governed by the sexual felony provisions of AS 12.55.125(i)(4).

Under AS 12.55.125(i)(4), the presumptive sentencing range for a class C sexual felony depends on two factors: (1) how many prior felonies the defendant has, and (2) whether those prior felonies are sexual felonies or non-sexual felonies.[4]

Williams had two prior felonies, but neither of them was a sexual felony. He had a burglary conviction from 1992, and he had a forgery conviction from 1994. Because these prior felonies were so old, a question arose at Williams's sentencing as to whether he should be treated as a third felony offender or, instead, only a first felony offender.

AS 12.55.145(a) is the statute that governs how prior offenses are counted for purposes of presumptive sentencing. One provision of this statute, subsection (a)(1)(A), declares that:

- a prior conviction for an unclassified or a class A felony is always counted as a "prior felony conviction" for presumptive sentencing purposes, but

- prior convictions for class B or class C felonies are not counted *if* the defendant was unconditionally released from supervision for their most recent felony ten years or more before the defendant committed their present offense.

---

[3]  AS 11.61.127(g).

[4]  AS 12.55.125(i)(4)(A)-(E).

– 4 –                                                          2594

(In general, see *Gilley v. State*, 955 P.2d 927 (Alaska App. 1998), where this Court interpreted this statute.)

As we have explained, Williams had a burglary conviction from 1992 and a forgery conviction from 1994. These are class B and class C felonies — and although the record does not contain Williams's exact dates of discharge from supervision for these felonies, the State does not dispute that Williams was discharged from supervision at least ten years before the date of his current offense (November 19, 2012).

Based on this, Williams's attorney argued that Williams should be treated as a first felony offender for purposes of his current sentencing. But the superior court concluded that, despite the ten-year "expiration" provision of AS 12.55.145(a)(1)(A), Williams should be treated as a third felony offender. The superior court reached this conclusion because another subsection of AS 12.55.145(a) — subsection (a)(4) — contains a separate set of rules for defendants who are being sentenced for sexual felonies under AS 12.55.125(i).

Subsection (a)(4) does not contain an "expiration" provision like the one contained in subsection (a)(1)(A). Because of this, the superior court concluded that a defendant's old felonies never "expire" — *i.e.*, they always count — if the defendant is being sentenced for a sexual felony.

For the reasons we are about to explain, we disagree with the superior court's interpretation of AS 12.55.145(a).

Originally, AS 12.55.145(a) had only one set of rules for counting "prior convictions" — the set of rules that is now codified in subsection (a)(1) of the statute.

The first of these rules is subsection (a)(1)(A) — the "expiration" rule that we have been discussing. The next rule is subsection (a)(1)(B) — the rule that defines when an out-of-state conviction counts as a "prior felony conviction". And the third rule

is subsection (a)(1)(C) — the rule that defines when two or more convictions arising from a continuous criminal episode should only be counted as one prior conviction.

In 1996, the Alaska Legislature enacted new sentencing rules for habitual felony offenders; see AS 12.55.125(l). [5] These new rules for habitual offenders hinge on a subset of the defendant's prior felony convictions — specifically, the number of the defendant's prior convictions for "most serious felonies". Accordingly, the legislature added a new subsection to AS 12.55.145(a) — subsection (a)(2) — that defines the rules for ascertaining the number of a defendant's "most serious felonies". *See* SLA 1996, ch. 7, § 8.

In 1998, the Alaska Legislature enacted new minimum sentences for misdemeanor assault involving domestic violence. [6] These minimum sentences hinge on a defendant's number of previous convictions for "a crime against a person" or "a crime involving domestic violence". Because the legislature wanted to use a shorter, five-year "expiration date" for these prior offenses, the legislature added a new subsection to AS 12.55.145(a) — subsection (a)(3) — to codify the five-year expiration rule for this category of crimes. *See* SLA 1998, ch. 86, § 10.

And in 2003, the Alaska Legislature enacted new presumptive sentencing ranges for sexual felonies. [7] These new presumptive ranges hinge not only on a defendant's number of prior "felonies" but also on a defendant's number of prior "sexual felonies". Because of this, the legislature added a new subsection to AS 12.55.145(a) — subsection (a)(4) — that contains rules for ascertaining the number of a defendant's "sexual felonies". *See* SLA 2003, ch. 90, § 6.

---

[5]  *See* SLA 1996, ch. 7, § 7.

[6]  *See* SLA 1998, ch. 86, § 9.

[7]  *See* SLA 2003, ch. 90, § 5.

At the same time, the legislature amended the introductory wording of subsection (a)(1) (the subsection containing the original set of rules) to say that the rules set forth in subsection (a)(1) apply when a defendant is being sentenced under "AS 12.55.125(c), (d), or (e)" — in other words, when the defendant is being sentenced for any class A, class B, or class C felony other than a sexual felony.

Thus, AS 12.55.145(a) seemingly has two different sets of rules for determining the number of a defendant's prior convictions: the rules contained in subsection (a)(1) that apply when a defendant is being sentenced for a *non-sexual* class A, class B, or class C felony, and the rules contained in subsection (a)(4) that apply when a defendant is being sentenced for a *sexual* felony.

The "sexual felony" subsection, (a)(4), does not contain a provision that mirrors the ten-year "expiration" provision of subsection (a)(1)(A).

Based on this, the superior court in Williams's case concluded — and the State now argues — that there is no expiration provision for offenders who are being sentenced for a sexual felony. In other words, the State contends that all of the defendant's prior class B and class C felony convictions count, regardless of how long ago the defendant was released from supervision for those felonies.

But the "expiration" rule is not the only provision that is missing from the "sexual felony" provisions set forth in subsection (a)(4). Here is the text of subsection (a)(4):

> [When a defendant is being sentenced for a sexual felony under] AS 12.55.125(i),
>
> (A) a conviction in this or another jurisdiction of an offense having elements similar to those of a sexual felony is a prior conviction for a sexual felony;

(B) a felony conviction in another jurisdiction making it a crime to commit any lewd and lascivious act upon a child under the age of 16 years, with the intent of arousing, appealing to, or gratifying the sexual desires of the defendant or the victim is a prior conviction for a sexual felony; [and]

(C) two or more convictions arising out of a single, continuous criminal episode during which there was no substantial change in the nature of the criminal objective are considered a single conviction unless the defendant was sentenced to consecutive sentences for the crimes; offenses committed while attempting to escape or avoid detection or apprehension after the commission of another offense are not part of the same criminal episode or objective.

These provisions define what counts as a prior "sexual felony". But these provisions do not define what counts as a "prior felony" in the broader sense — *i.e.*, in the sense of "all prior felonies, including non-sexual felonies".

This is a significant omission — because, as we have explained, the presumptive sentencing ranges for sexual felonies hinge on both the number of a defendant's prior sexual felonies *and* the number of a defendant's prior non-sexual felonies. To ascertain the applicable presumptive sentencing range in a given case, the sentencing court must know both of these numbers.

Subsection (a)(4) does not contain an "expiration" provision for class B and class C felonies. But neither does it contain a provision that allows a court to count a defendant's out-of-state felony convictions (unless those convictions are for "lewd and lascivious act[s] upon a child under the age of 16 years").

Thus, if we were to adopt the position advocated by the State — the position that subsections (a)(1) and (a)(4) are mutually exclusive, and that the rules

contained in subsection (a)(1) do not apply when a defendant is being sentenced for a sexual felony — then a defendant's out-of-state felonies would not be counted.

We conclude that the more reasonable interpretation of AS 12.55.145(a) is to read subsections (a)(1) and (a)(4) together, as complementary provisions that provide the rules for ascertaining the total number of a defendant's prior felony convictions and, from among this total, the number of a defendant's prior sexual felony convictions.

This interpretation is supported by the history of the statute itself.

As we explained, when AS 12.55.145(a) was originally enacted, a sentencing court had to count the number of a defendant's prior felony convictions, and the statute contained the rules for doing that. When the legislature created a new category, "most serious felony", for the sentencing of habitual offenders, the statute was amended by adding a new subsection that contained the rules a court was to follow when calculating the number of a defendant's prior "most serious felonies". And when the legislature created yet another new category, "sexual felony", to be used in the sentencing of sexual felony offenders, the statute was again amended by adding a new subsection that contained the rules a court was to follow when calculating the number of a defendant's prior "sexual felonies".

But these new categories of felony were not intended to supplant the original definition of "prior felony". Indeed, as we have explained, when a court sentences a defendant for a sexual felony, the court must know *both* the number of a defendant's prior felonies *and* the number of a defendant's prior sexual felonies. We therefore conclude that the rules contained in subsection (a)(4) of the statute were intended to supplement, rather than replace, the rules contained in subsection (a)(1).

In other words, subsection (a)(1) of the statute provides the baseline rules for counting the number of a defendant's qualifying prior felony convictions, and

subsection (a)(4) provides the rules for counting the special sub-category of "sexual felonies".

Under subsection (a)(1), Williams's prior felony convictions for burglary and forgery should not have been counted, because Williams was released from supervision for his most recent felony ten years or more prior to his current offense. We therefore hold that the superior court should have sentenced Williams as a first felony offender.

We acknowledge that our interpretation of AS 12.55.145(a) is at odds with what we previously said in two unpublished decisions: *Kuku v. State*, 2013 WL 5532714 at *8 (Alaska App. 2013), and *Hunter v. State*, 2007 WL 2405208 at *17 (Alaska App. 2007). Because those two prior decisions were unpublished, they need not be "overruled" in a formal sense. However, for the reasons explained in this opinion, we disavow our earlier statements in *Kuku* and *Hunter*.

We now turn our attention to Williams's attacks on his convictions.

*Underlying facts of Williams's case*

The Chilkoot Indian Association has an office in Haines. In November 2012, the reception area of this office had a computer that was available for the use of Association members.

The computer was not used frequently, and no one used the computer on a regular basis. But in the weeks preceding November 19, 2012, Randolph Williams used this computer many times.

Sometime in the late morning of November 19, 2012, Williams came to the Association to use the computer again. The computer was located in an area where Association employees frequently had to walk past it in order to access the office's

copier/fax/scanner. Two Association employees saw Williams using the computer that day, and Williams's actions made them suspicious.

One employee, Mary Brouillette, testified that Williams came into the Association's office during mid-morning on the 19th, sometime between 10:00 a.m. and 11:30 a.m. When Brouillette walked past Williams at the computer, Williams looked surprised. He minimized the image on the computer screen, and he leaned in toward the computer to shield the computer screen from Brouillette's view.

Despite Williams's efforts to hide the screen, Brouillette saw an image of a naked person on the screen in a "splayed out" position, and this person did not look like an adult. Brouillette went to tell other office employees that Williams was "looking at porno" on the reception-area computer.

David Berry, the tribal administrator, also saw Williams at the computer on November 19th, although Berry's contact with Williams was apparently later in the morning. According to Berry, he saw Williams enter the office "close to noon" or a little after.

Berry observed Williams engaging in the same behavior that Brouillette had seen: when Berry walked past Williams at the computer, Williams moved his shoulder to block Berry's view of the computer screen. Berry observed "a bunch of small photos" on the screen, but he could not tell what those photos depicted. Williams left the Association's office about ten minutes later.

After Williams left, Berry sat down at the computer. Williams had turned off the monitor, so Berry turned it back on. When Berry turned on the monitor, he noticed that the Windows "recycle bin" was open, and there were over a dozen .JPEG files in the recycle bin. (JPEG is a format used for storing compressed digital images.)

Berry could not see what these .JPEG files contained, and he could not open them while they were in the recycle bin. But when Berry restored one of the files from

the recycle bin to the Windows desktop, he was able to open the file. It was a photograph of a young girl with her genitals exposed. Having seen the contents of this one file, Berry stopped and did not open the other files.

A few minutes later, the Association's program manager, Harriet Brouillette, arrived at the office. Berry and Mary Brouillette immediately informed her what had happened.

Harriet Brouillette did not want to accuse Williams of anything until she had double-checked the computer, so she and Berry sat down at the computer and checked the computer's browser history. This history contained a list of pornography websites. Some of the browser history entries were date-and-time-stamped for earlier that day, while other entries were stamped for previous days.

When Berry clicked on one of the browser history links, it brought up a picture of a young girl without any underwear. Harriet Brouillette then called the Haines police.

Williams returned to the Association office before the police arrived. He asked to use the computer again, but he did not say why. When Harriet Brouillette told Williams that the computer was no longer available, Williams looked nervous and kept glancing at the computer. He eventually left without saying anything more.

Police Chief Gary Lowe arrived at the Association's office around 1:00 p.m. He spoke with Harriet Brouillette, Mary Brouillette, and David Berry, and then he inspected the computer.

There was a list of file names in the computer's recycle bin. When Lowe changed the folder view from a listing of file names to a thumbnail view of each file, the resulting thumbnails appeared to be child pornography.

As Berry had discovered earlier, Lowe could not view the full-size images of these photos while the files were in the recycle bin. So Lowe photographed the

computer screen showing the recycle bin with the thumbnails, and then he restored the files from the recycle bin to their original locations on the computer, and then he opened the images one by one. Lowe documented each image by taking two photographs of the computer screen: one of the image itself, and one showing the file properties of that image. Those properties included a date-and-time stamp showing when the image had been created and another date-and-time stamp showing when the image had been sent to the recycle bin.

In total, Chief Lowe found eleven images of child pornography on the Association's computer: nine images in the recycle bin, plus the additional one that had been restored to the desktop earlier by Berry, plus one that Lowe found in the files of the computer's internet browser history. (Other files in the browser history had apparently been deleted; Lowe could not open them.)

Lowe then seized the computer and sent it to the crime lab in Anchorage for forensic analysis.

The grand jury indicted Williams for possessing all eleven of these pornographic images. However, Williams was ultimately convicted of only eight of these counts.

Specifically, the trial jury acquitted Williams of possessing three images that were created and deleted from the computer on Tuesday afternoon, November 13, 2012. The jury convicted Williams of possessing the remaining eight images. Those images were both created and deleted from the computer over the course of approximately 20 minutes around noon on Monday, November 19, 2012.

*Williams's motion to dismiss the indictment*

Following his indictment, Williams's attorney filed a motion asking the superior court to dismiss the indictment on the ground that the State had failed to apprise the grand jury of exculpatory evidence. [8] The purported exculpatory evidence was the testimony of David Kyle, the pastor of the Salvation Army in Haines. Here is how Pastor Kyle became involved in Williams's case.

After Chief Lowe determined that the Association's computer contained child pornography, he decided to take Williams into custody. Around 2:00 p.m., Lowe located Williams at his mother's house. Lowe arrested Williams and brought him to the police station for questioning. Williams told Chief Lowe that he had been at the Salvation Army facility earlier that day, but he acknowledged that he had gone to the Chilkoot Indian Association office to use the Association's computer to check his e-mail.

Following his arrest, Williams telephoned Pastor Kyle. Williams apparently told Kyle that he had been accused of burglary — *i.e.*, of breaking into the Association's office — and he asked Kyle to call the police and tell them that he (Williams) had been at the Salvation Army facility that morning.

Prior to the grand jury hearing in Williams's case, Kyle contacted Chief Lowe by phone and told him that Williams had been at the Salvation Army for over an hour in the late morning of November 19th, around the time when the pornographic images were placed on the Association's computer and then moved to the computer's recycle bin.

---

[8] *See Frink v. State*, 597 P.2d 154, 164-66 (Alaska 1979) (holding that, under Alaska law, a prosecutor who presents a case to the grand jury has a duty to apprise the grand jurors of exculpatory evidence).

Williams's attorney asked the superior court to dismiss the indictment against Williams because the State did not inform the grand jury of Kyle's phone call to Chief Lowe. According to the defense attorney, Kyle's statements to Lowe constituted evidence of alibi, and this evidence should have been presented to the grand jury.

The superior court held an evidentiary hearing on this motion. At this hearing, Pastor Kyle testified that he called the Haines Police Department and spoke to Chief Lowe about Williams's case. Kyle asserted that, between himself and his wife and his son-in-law, the three of them could account for Williams's continuous presence at the Salvation Army building on Monday, November 19th between 11:30 a.m. and 12:30 p.m.

(This time frame was significant because eight of the pornographic images found on the Association's computer were created (*i.e.*, placed on the computer) and then deleted (*i.e.*, moved to the recycle bin) during the 20-minute period between 11:45 a.m. and 12:04 p.m. on November 19th.)

However, Kyle's assertion that Williams had been continuously present at the Salvation Army was called into question by other evidence. First, Kyle himself admitted that he and his wife and his son-in-law were all extremely busy that morning, preparing and distributing food to Salvation Army clients for the Thanksgiving holiday. Kyle also conceded that there was no single person who could account for Williams's presence all morning; that is, no one was observing Williams constantly during that time.

Second, at the time of the evidentiary hearing, Kyle mistakenly believed that the Chilkoot Indian Association office was located outside of Haines on Sawmill Road, between a half-mile and three-quarters of a mile away — so that it would take someone about twenty minutes to walk there from the Salvation Army building. But, in fact, the Association's office was located in town, only a few blocks away from the Salvation Army.

After conducting this evidentiary hearing, Superior Court Judge *pro tem* Keith B. Levy denied the defense motion to dismiss the indictment. Judge Levy found Kyle's testimony to be credible (except for Kyle's mistake about the location of the Association's office). However, the testimony of the Association employees clearly placed Williams at the Association's office in the late morning and around noon on November 19th. According to the employees' grand jury testimony, Williams viewed at least one pornographic image on the Association's computer, and he actively hid the screen from two Association employees. In addition, as we have already noted, Williams himself admitted to Chief Lowe that he had used the Association's computer to check his e-mail that morning.

Based on this record, Judge Levy concluded that the grand jurors still would have indicted Williams even if they had heard testimony from Kyle.

Williams now renews his argument that the indictment should be dismissed because the State failed to present Kyle's testimony to the grand jury.

Although the State has a duty to present exculpatory evidence to the grand jury, that duty only extends to evidence that is "substantially favorable" to the defendant — meaning evidence "that tends, in and of itself, to negate the defendant's guilt." *Cathey v. State*, 60 P.3d 192, 195 (Alaska App. 2002). A prosecutor is not required "to develop evidence for the defendant [or] present every lead possibly favorable to the defendant." *Frink v. State*, 597 P.2d 154, 166 (Alaska 1979).

Given the evidence in Williams's case, this is not a situation where Kyle's testimony, in and of itself, would have cast so much doubt on the State's allegations as to "negate [Williams's] guilt". Kyle's testimony at the hearing was obviously favorable to Williams's defense — but, as shown by Kyle's later trial testimony, Kyle's account left important questions unanswered.

For example, when Kyle was cross-examined at trial, it became clear that Kyle himself had *not* seen Williams at the Salvation Army building starting at 11:30 a.m. Kyle only saw Williams from "about" 12:00, or "12:00-ish", until 12:30 p.m., when Kyle observed Williams charging his phone outside Kyle's office. This adjusted time frame made the State's case significantly more plausible: it was consistent with the theory that Williams loaded and then deleted the pornographic images on the Association's computer between 11:45 a.m. and 12:04 p.m., and that Williams then walked back to the Salvation Army to charge his phone.

For these reasons, we uphold the superior court's denial of Williams's motion to dismiss the indictment.

*Williams's request for a <u>Thorne</u> instruction*

To explain this jury instruction issue, we must first describe a particular facet of Microsoft's Windows operating system. The Windows operating system has the ability to keep track of the date and time at which a computer file was last "accessed".

(In this context, "accessed" is a technical term that encompasses a significantly wider range of activity than simply a person's opening a file to view or modify it. We will say more about this later.)

According to the expert testimony at Williams's trial, this date-and-time stamping function operates behind the scenes. Thus, when Chilkoot Indian Association employee David Berry opened the first pornographic image on the Association's computer, he inadvertently altered the "last accessed" property of that file. And when the Haines police chief retrieved the rest of the pornographic images from the recycle bin and opened them — to see if the images were, indeed, child pornography, and to

preserve this evidence by taking photographs of the images — he, too, altered the "last accessed" property of those image files.

At trial, Williams's attorney asserted that if someone had preserved the *previous* "accessed" date-and-time stamps of those files, those date-and-time stamps could have been exculpatory to Williams. Based on this assertion, the defense attorney asked the trial judge to instruct the jurors that they should presume that the earlier "accessed" date-and-time stamps would have been exculpatory if they had been preserved. The trial judge declined to give this instruction.

Williams now renews this argument on appeal. He suggests that if the earlier "last accessed" date-and-time stamps had been preserved, this information might potentially have shown that the files were accessed at a time when Williams was not using the Association's computer. Alternatively, Williams argues that the "last accessed" date-and-time stamps for these files might have shown that he only accessed these files because he inadvertently discovered them on the computer and then immediately deleted them.

Williams further argues that Chief Lowe was at fault for overwriting the previous "last accessed" date-and-time stamps. Williams contends that, because the chief was an experienced investigator, he must have known (or reasonably should have known) that he would overwrite the "last accessed" property of each file when he opened them.

Thus, Williams contends, the trial judge should have given his requested *Thorne* instruction regarding the "last accessed" property of these files — an instruction telling the jury to presume that the earlier "last accessed" date-and-time stamps of the pornographic files would have been favorable to Williams's case.

In *Thorne v. Department of Public Safety*,[9] the Alaska Supreme Court addressed the question of the proper remedy for situations where the police destroy evidence that they have gathered during a criminal investigation.

The defendant in *Thorne* was arrested for driving under the influence and he was taken to jail, where he was asked to perform sobriety tests. The police videotaped Thorne's performance of these sobriety tests, but they erased and re-used the videotape after Thorne's criminal case was resolved by a plea to the lesser charge of negligent driving. Thus, the videotape was no longer available when the Department of Public Safety took administrative action against Thorne's driver's license.

The supreme court held that the police violated Thorne's right to due process when they destroyed the videotape before the administrative proceeding was resolved. The court then considered the type of remedy that Thorne should receive:

> We now address the appropriate sanction for the state's failure to preserve the videotape. The state's good or bad faith in failing to preserve the videotape is relevant to determining the appropriate sanction. We look to the degree of culpability on the part of the state, the importance of the evidence lost, the prejudice suffered by the accused, and the evidence of guilt adduced at the trial or hearing.
>
> We think an appropriate sanction in this case would be to remand the case back to the [administrative] hearing officer with directions to presume that the videotape would have been favorable to Thorne.

*Thorne*, 774 P.2d at 1331 (citations omitted).

---

[9] 774 P.2d 1326, 1331-32 (Alaska 1989).

In the present case, Williams argues that he was entitled to a *Thorne* instruction concerning the Windows "last accessed" property of the pornographic files found on the Chilkoot Indian Association's computer.

In their briefs to this Court, the parties dispute whether the pornographic images were "collected" by Chief Lowe (thus triggering the chief's duty under *Thorne* to preserve the evidence). But Williams's case raises other issues related to *Thorne*.

In retrospect, it can be seen that the *Thorne* decision arose from relatively easy facts. No one disputed that the video accurately portrayed Thorne's performance on the field sobriety tests; no one disputed that the video could have been preserved indefinitely; and no one suggested that watching the video later would alter its contents in any material way.

This is not always the case. There are times when a defendant might reasonably argue that the very act of removing an article of evidence from a crime scene (or from some other location) would either alter relevant characteristics of the article or alter relevant characteristics of the location. For example, the defendant might argue that the amount of moisture on the ground underneath the item was probative of some fact, and that the removal of the item led to an alteration of this ground moisture.

Williams's case is analogous to this kind of situation. Williams argues that the very act of viewing the contents of the pornographic files worked a significant change in the properties of those files — *i.e.*, not a change in the images themselves, but rather a change in the information about those files that is collected and stored by the Windows operating system (*i.e.*, some of the "metadata" pertaining to those files).

For the reasons we are about to explain, we conclude that we need not decide whether the pornographic images were "collected" by Chief Lowe when he viewed them on the Association's computer, nor do we need to decide some of the other potential questions regarding the scope of the *Thorne* decision.

Even if we assume that Chief Lowe's actions constituted the act of "collecting" the pornographic images, we conclude that the trial judge's refusal to give a *Thorne* instruction was reasonable for two reasons. First, Williams failed to allege or offer any evidence that the police chief was at fault for failing to preserve the previous "last accessed" date-and-time stamps of the pornographic images. And second, under the facts of Williams's case, there is no reasonable possibility that the "last accessed" dates of the eight images created on Monday, November 19th could have been exculpatory — and those eight images were the only ones that Williams was convicted of possessing.

In total, eleven pornographic images were found on the Chilkoot Indian Association's computer. Of these, three images were "created" (*i.e.*, placed on the Association's computer for the first time) and then "deleted" (*i.e.*, moved to the Windows recycle bin) on the afternoon of Tuesday, November 13, 2012. They were not discovered until six days later, when the Association employees observed Williams acting suspiciously when he used the computer.

The remaining eight pornographic images were all placed on the Association's computer within a 14-minute span on Monday, November 19, 2012 (between 11:45 a.m. and 11:59 a.m.), and these eight images were moved to the recycle bin at the same time — at 12:04 p.m., shortly after the last one was "created" (*i.e.*, placed on the computer).

When the State's forensic computer expert, Angela Worthy, examined the Association's computer, she found that the "last accessed" date-and-time stamps on all eleven of these files showed that the files were "last accessed" around one hour later — between 12:54 p.m. and 1:38 p.m. on November 19th. This was when David Berry and Chief Lowe opened those files to view the images (and to allow Lowe to photograph the computer screen display of each image).

Because a Windows computer only retains the most recent date and time that a file was accessed, when Berry and Lowe opened the files to view them, their actions overwrote the previous "last accessed" date-and-time stamp for those files.

The *Thorne* decision directs us to consider a series of factors when deciding whether the destruction of evidence in the State's possession should result in a sanction against the State: (1) the State's good or bad faith in failing to preserve the evidence; (2) the degree of culpability on the part of the State; (3) the importance of the evidence that was lost, in light of the other evidence in the case; and (4) the degree of prejudice suffered by the accused.

With regard to the first factor (the good or bad faith of the State's agents), there is no evidence of bad faith on the part of Chief Lowe, or on the part of Association employee David Berry, for that matter.

With regard to the second factor (the State's degree of culpability), the record fails to support Williams's assertion that Chief Lowe acted culpably.

We note that when Williams's trial attorney argued this matter to the trial judge, he did *not* assert that Chief Lowe acted culpably. Rather, the defense attorney argued that, once Williams showed that he had been prejudiced by the loss of evidence, he was entitled to a *Thorne* instruction *regardless* of whether Lowe acted culpably.

The defense attorney told the trial judge that Lowe's culpability (or lack of culpability) only made a difference to the extent that, *if* the chief had intentionally or knowingly destroyed evidence, then Williams would have been entitled to a harsher remedy than merely a jury instruction. But the defense attorney clarified that "[he was] not arguing that [Lowe] intentionally destroyed the access date, or [that he] knowingly did it. We're just saying that it happened."

This matter was further clarified a few minutes later, when the defense attorney seemingly began to suggest that Chief Lowe might bear some level of

culpability.  The defense attorney told the judge that Chief Lowe "went through all these pictures knowing that they had metadata on them, knowing that he wasn't ... [a] computer expert, knowing that [the computer] was going to go to somebody else".  But at this point, the trial judge interrupted the defense attorney:

>*The Court*:  Did [Chief Lowe] say that he knew it would alter things?

>*Defense Attorney*:  I don't know that he said that he knew it would alter things.  But I also don't think that's a necessary finding for the [present] discussion.

>*The Court*:  You said [that] he did this knowing that [an alteration of metadata] would result.

>*Defense Attorney*: No.  I said specifically [that] we're not arguing intent or knowingly.

>*The Court*:  No, but he — Okay, but you were using the words, "He opened it knowing there was metadata, knowing it would disappear."  I thought that's what you said.

>*Defense Attorney*:  I don't think he — I'm sorry if I said "knowing it would disappear".  I said [that] he opened it knowing there was metadata on those images.  Because he said he had training in that, and he said he was familiar enough with them.  [But] again, ... you know, had [the chief] known that [his actions] would have destroyed the metadata, I think we could have asked for harsher sanctions in this case — which we're not doing.

>The only question here is, "Did it prejudice Mr. Williams's ability to make a defense?"  And ... that's the only standard we have to meet before we get [a *Thorne*] instruction.

Thus, even though Williams now asserts on appeal that the State is culpable because Chief Lowe knew or should have known that his act of opening and viewing the computer files would overwrite the previous "last accessed" date-and-time stamps on those files, Williams's trial attorney expressly disavowed any reliance on such an assertion when he argued this matter in the trial court.

We also note that, in the trial court, Williams offered no suggestion as to how Chief Lowe could have viewed the computer files without altering their "last accessed" date-and-time stamps. Instead, the defense attorney argued that Chief Lowe should have stopped opening the files after he saw the first one.

It is unclear whether it would have made any difference, at that point, even if Chief Lowe had desisted from opening and viewing the rest of the image files. In the Windows operating system, "accessing" a computer file is not limited to opening the file to view it or modify it. Windows treats a broader range of actions as constituting an "access". For example, Windows considers a file to have been "accessed" if a user generates a preview of the file, or even if a user switches the folder view from a listing of file names to thumbnail images of the files. Likewise, a file is considered to have been "accessed" if a user — or an automatic computer backup program — backs up the file. Ironically, Windows considers a file to have been "accessed" even when someone simply checks the file for its "accessed" date-and-time stamp, by right-clicking on the file and opening the file's "properties" screen. [10]

---

[10] *See When was a file last accessed in Windows 7?*, Superuser (August 4, 2016), https://superuser.com/questions/1109640/-when-was-a-file-last-accessed-in-windows-7 and
Raymond Chen, *How do I access a file without updating its Last-Access time?* (October 10, 2011), https://blogs.msdn.microsoft.com/oldnewthing/-20111010-00/?p=9433.

Turning to the remaining *Thorne* factors — the importance of the lost evidence and the degree of prejudice that Williams suffered — we note that the State's own expert acknowledged (in her trial testimony) that, when Chief Lowe opened the files to look at the images, his actions overwrote the previous "accessed" date-and-time stamps of these files. The State's expert also acknowledged that, because of this overwriting, there was no way to know whether those files had been previously opened (or accessed in any other manner) after their "creation" — *i.e.*, after they were first placed on the Chilkoot Indian Association's computer.

Thus, the jury was well aware of the consequences of the police chief's actions. But within the factual context of Williams's case, the police chief's actions had little significance.

It was undisputed that eight of the pornographic files were loaded onto the Association's computer, and then deleted, within a 20-minute time frame on Monday, November 19th. The first of these eight files was "created" (*i.e.*, placed on the computer) at 11:45 a.m., and the last of them was created at 11:59 a.m. About five minutes later, all eight files were deleted (by moving them to the recycle bin).

By definition, the previous "last accessed" date-and-time stamps of those files could not have pre-dated the dates and times of their creation. And, again by definition, the previous "last accessed" date-and-time stamps of these files could not have been later than the dates and times that these files were deleted. Thus, even though Chief Lowe created new "accessed" dates and times by retrieving the files from the recycle bin and then opening them, the previous "last accessed" dates and times of these eight files had to have been during the 20 minutes between 11:45 a.m. and 12:04 p.m. on Monday, November 19th.

In other words, even if the previous "accessed" dates and times of those eight files had somehow been preserved, the question for the jury would remain the

same: Was Williams operating the Association's computer between 11:45 a.m. and 12:04 p.m. on November 19th, when those eight pornographic files were created and then deleted?

This was not true for the three pornographic files that were created the preceding week, on the afternoon of Tuesday, November 13th — but the jury acquitted Williams of possessing those three files.

Given these facts, even if we presume that the computer files were "collected" by Chief Lowe (so that he became responsible for them under *Thorne*), our analysis of the *Thorne* criteria leads us to conclude that the trial judge acted within his discretion when he declined to give the jury a *Thorne* instruction regarding the "last accessed" date-and-time stamps.

We note that the judge gave Williams's attorney full rein to argue (at some length) that the State's investigation was substandard and inconclusive because Chief Lowe's actions had resulted in the destruction of forensic evidence.

This was a proper way of handling this situation, and we therefore uphold the trial judge's ruling on this issue.

*The sentencing judge's imposition of consecutive imprisonment for each count of possessing child pornography*

When Judge Levy sentenced Williams on the eight counts of possessing child pornography, he imposed 15 years to serve on each count. These sentences were almost entirely concurrent, but the judge specified that one day of each sentence would be consecutive. On appeal, Williams suggests that Judge Levy imposed these few consecutive days of imprisonment because the judge mistakenly thought that this was required by AS 12.55.127(d).

This statute — which requires the imposition of "some additional term of imprisonment" for each count of possessing child pornography — was in effect when Williams was sentenced in 2015. But there was no requirement of consecutive sentences when Williams committed his crimes in 2012. The consecutive sentencing provision was not enacted until 2013. *See* SLA 2013, ch. 43, § 21.

When the legislature enacts new, more severe penalties for a crime, the *ex post facto* clauses of the federal and state constitutions prohibit the application of these new penalties to defendants who committed their offenses before the new penalties were enacted. [11] The State concedes that the present version of AS 12.55.127(d) does not apply to Williams's sentencing, and that Judge Levy was not required to impose small consecutive terms of imprisonment for each count.

Because Williams must be re-sentenced, Judge Levy will have an opportunity to clarify his reasons for imposing those few days of consecutive jail time.

*Conclusion*

We AFFIRM Williams's convictions for possessing child pornography, but we VACATE his sentence, and we REMAND this case to the superior court with directions to re-sentence Williams as a first felony offender under the provisions of AS 12.55.125(i)(4)(A).

We do not retain jurisdiction of this case.

---

[11] *See Doe v. State*, 189 P.3d 999, 1003 (Alaska 2008); *Dobbert v. Florida*, 432 U.S. 282, 292; 97 S.Ct. 2290, 2298; 53 L.Ed.2d 344 (1977).