NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

|  |  |
|---|---|
| CHAD ALAN ZURLO,<br><br>Appellant,<br><br>v.<br><br>STATE OF ALASKA,<br><br>Appellee. | Court of Appeals No. A-12805<br>Trial Court No. 4FA-14-01372 CR<br><br>O P I N I O N<br><br>No. 2720 — February 18, 2022 |

Appeal from the Superior Court, Fourth Judicial District, Fairbanks, Douglas L. Blankenship, Judge.

Appearances: Margi A. Mock, under contract with the Public Defender Agency, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Patricia L. Haines, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, Harbison, Judge, and Hanley, District Court Judge.[*]

Judge ALLARD, writing for the Court.
Judge HANLEY, concurring.

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

The question presented by this case is whether the trial court should have dismissed an indictment after the prosecutor violated his duty to present exculpatory evidence and deliberately presented a distorted view of the evidence to the grand jury. For the reasons explained in this opinion, we conclude that the indictment should have been dismissed. Therefore, in accordance with Alaska law, we reverse the conviction in this case.

*Relevant facts and proceedings*

Chad Alan Zurlo and his girlfriend, Serena Vallier, moved to Fairbanks in April 2014 in response to an employment offer from Steven Corcoran, who had previously worked with Zurlo in Washington. After Zurlo and Vallier arrived in Fairbanks, Corcoran discovered that Zurlo no longer had the qualifications for the job Corcoran offered. This created tension between the two men and was the source of many arguments.

A few weeks after Zurlo and Vallier arrived, Corcoran rented a house and offered to sublet the lower level of the house to the couple. The lower level consisted of an open family room basement that did not have a door. Zurlo and Vallier moved in on May 1.

Corcoran was a heavy drinker who became loud and aggressive when he drank. On the night that Zurlo and Vallier moved in, Corcoran came into their living space uninvited and intoxicated. Zurlo asked Corcoran to announce his presence before entering their living space, which caused Corcoran to quickly become angry and threatening. According to both Zurlo and Vallier, Corcoran told Zurlo that he had a gun and that he would "fucking shoot [Zurlo]." Corcoran also allegedly told Zurlo to "get out of here or I'll just fucking kill you next time."

Seven days later, on May 8, Corcoran again came into Zurlo and Vallier's living space uninvited and intoxicated. The couple was lying in bed at the time. Zurlo again asked Corcoran to announce himself before entering, and Corcoran again became angry.

According to Vallier, Corcoran said something to the effect that "this is my house, you know, I do whatever the fuck I want, and if you don't like it, you can get the hell out." Vallier later testified that Corcoran would not leave and he continued to follow Zurlo and yell at him, goading him to "come at him, to fight him." Vallier was frightened, and she "kind of tuned out what was being said." She did not hear Corcoran threaten to shoot Zurlo; nor did she see Corcoran with a gun.

At one point, Vallier saw Corcoran step up to the bed, and she saw his hand go down towards his side. Out of her peripheral vision, Vallier saw Zurlo reach over to the nightstand to grab his gun from its holster; Zurlo then fired a shot at Corcoran, hitting him in the head. Corcoran died at the scene.

Following his arrest, Zurlo waived his *Miranda* rights and one of the investigating officers, Investigator Edward Halbert, interviewed him. Although Zurlo's version of events was slightly different from Vallier's, Zurlo was fairly consistent about what he believed had happened.

According to Zurlo, Corcoran was drunk and became angry when Zurlo asked him to announce his presence before entering their living space. Zurlo said that Corcoran was screaming and yelling about how it was his house. Zurlo said he was trying to get away from him, and Corcoran said "something about, I can — I can end you right now, or I should kill you right now, or something." Immediately after this threat, Zurlo said that he saw Corcoran reach behind his back. Zurlo told Halbert that he thought Corcoran was reaching for a gun, and before he "even realized exactly what had happened, [he] pulled and fired" his own gun.

Initially, Zurlo told Halbert that he pulled his gun from a holster on his body. But when Halbert told him that Vallier said that the gun was on the nightstand, Zurlo recalled that he was not wearing pants and he agreed that he had grabbed the gun from the nightstand. Zurlo was consistent, however, in stating that Corcoran threatened to kill him that night and that he thought that Corcoran had a gun.[1] Zurlo told Halbert that he knew Corcoran had some rifles and handguns, although he had not seen them personally. He also said that Corcoran had threatened to shoot him about a week earlier when he and Vallier had first moved in.

Zurlo admitted that he did not see Corcoran with a gun on the night of the shooting. But he told Halbert that he thought Corcoran had a gun because of "the way [Corcoran] was standing [and] the way he was presenting himself." According to Zurlo, Corcoran had a drink in his left hand and he was "putting his right hand behind his back as he's saying, I can just fucking end you right now." Zurlo said he "[didn't] know what happened" and he "thought for sure [Corcoran] was reaching for a weapon."

Zurlo was charged with first-degree murder and a grand jury hearing was held May 15-16, 2014 in Fairbanks.

---

[1]  The following is a representative sample of the way Zurlo answered Investigator Halbert's questions:

> *Investigator Halbert*:  Last night, did he threaten to kill you, threaten any harm?
> *Zurlo*:  He — he said, I could end — I can end you right here and now.
> *Investigator Halbert*:  Where was he at?
> *Zurlo*:  Or I can end you right now.
> *Investigator Halbert*:  Where was he at when he said that?
> *Zurlo*:  He was right there.
> *Investigator Halbert*:  Did you feel he could do that?
> *Zurlo*:  He made that statement, started reaching behind his back, and the only thing I pictured was a gun coming out, and I just fired.

On the day of the grand jury hearing, but before it began, the prosecutor interviewed Serena Vallier. A paralegal from the prosecutor's office took notes of the interview. In the interview, Vallier told the prosecutor that, although she did not hear Corcoran threaten to kill Zurlo on the night of the shooting, Corcoran had "more than once said he was going to shoot [Zurlo]." Vallier also corroborated Zurlo's claim that Corcoran threatened to shoot Zurlo the first night they moved in and that Corcoran told the couple that he had a gun, although they did not see one. Vallier also said that Corcoran kept a gun in the back of his waistband.

A few hours after this interview, the prosecutor told the grand jury in his opening statement that Corcoran "wasn't known to carry a gun on his person or anything like that." Vallier was called as a witness to testify. The prosecutor did not ask her about Corcoran's prior threat to shoot Zurlo; nor did he ask whether Corcoran was known to carry a gun.

After Vallier testified, the prosecutor called Trooper Joseph Harris as a witness. Trooper Harris testified regarding Zurlo's post-arrest statements to Investigator Halbert.

Trooper Harris was authorized to testify regarding Zurlo's statements to Investigator Halbert under Alaska Criminal Rule 6(r)(3), which allows a peace officer who is involved in a criminal investigation to testify to another peace officer's statements and observations made during the course of the investigation, provided that additional evidence is introduced to corroborate the statement. Criminal Rule 6(r)(3) is an exception to the general rule that hearsay that would be inadmissible at trial is also inadmissible before the grand jury absent compelling justification.[2]

---

[2] Alaska R. Crim. P. 6(r)(1).

However, there are limits to how this exception can be used. Criminal Rule 6(r)(4) specifically provides that "[i]f the testimony presented by a peace officer under [Criminal Rule 6(r)(3)] is inaccurate because of intentional, grossly negligent, or negligent misstatements or omissions, then the court shall dismiss an indictment resulting from the testimony if the defendant shows that the inaccuracy prejudices substantial rights of the defendant."

As the superior court later found, Trooper Harris did not accurately portray Zurlo's statements to the grand jury. The substance of Trooper Harris's testimony began as follows:

> *Prosecutor*: . . . first of all, did [Zurlo] admit to killing Steven Corcoran?
>
> *Harris*: He admitted to shooting him in the face.
>
> *Prosecutor*: Okay. And what was his initial story of about how that occurred?
>
> *Harris*: He said that they were in an argument, that Steven had come down the stairs. They got into an argument. That he pulled a firearm from his waistband and shot him in the face.

Trooper Harris subsequently testified that Zurlo had "chang[ed] his story," and he told the grand jury that Zurlo had originally said that he pulled his gun from his waistband but he later admitted that he pulled the gun from the nightstand. The following exchange then occurred:

> *Prosecutor*: Okay. And why did he say that he shot [Corcoran]?
>
> *Harris*: He said it was just a reaction.
>
> *Prosecutor:* Okay. Did he state that he was threatened — well, did he say that he was physically assaulted, anything like that?

*Harris*:  No, he did not.

Trooper Harris then testified that Zurlo said that he did not see Corcoran with a gun that night, and he testified that Zurlo "never said that he saw [Corcoran] carrying a gun before." Trooper Harris also testified that the troopers had not found any handguns belonging to Corcoran when they searched the house, although they did recover "a couple of rifles." (The night after the grand jury proceeding was over, the troopers received a handgun belonging to Corcoran that had been found by Corcoran's girlfriend among his possessions.)

At the conclusion of the grand jury proceeding, the grand jury indicted Zurlo on one count of first-degree murder for intentionally killing Corcoran.

Zurlo subsequently moved to dismiss the indictment, arguing that the prosecutor had violated his duty to present exculpatory evidence and that the prosecutor had presented grossly inaccurate and misleading evidence to the grand jury in violation of Criminal Rule 6(r)(4). The State opposed the motion.

The superior court denied the motion. The court concluded that, because Vallier's grand jury testimony did not corroborate Zurlo's exculpatory statements, the prosecutor had either not violated his duty to provide exculpatory evidence or, alternatively, that any violation was harmless. The court expressed concern, however, regarding the omissions and inaccuracies in Trooper Harris's testimony.

The court was particularly disturbed by what it viewed as a "conscious decision" on the part of the prosecutor to prevent the grand jury from learning about Zurlo's claim of self-defense. The court noted that the prosecutor had started to ask the trooper whether Zurlo said that Corcoran threatened him, but the prosecutor then reformulated the question to ask only whether Corcoran had *physically assaulted* Zurlo. The court noted that "[t]he pause and restatement of the second question suggests it was [a] conscious decision by the prosecutor not to ask a question that would necessitate

opening up testimony about self-defense." The court further found that "[t]he failure of the State to elicit the full account of Zurlo's explanation of what he was reacting to is an omission" in violation of Criminal Rule 6(r)(4).

Despite these findings, the court denied the motion to dismiss, concluding that Zurlo had failed to show that the grand jury "almost surely" would have failed to indict if these violations had not occurred.

At the time the superior court issued its order, the court was unaware of Vallier's interview with the prosecutor in which she *had* corroborated Zurlo's claims that Corcoran was known to carry a handgun and that he had threatened to shoot Zurlo a week earlier. The prosecutor had not provided the defense with the paralegal's notes in discovery. The prosecutor also did not alert the court to the existence of these partially corroborating statements, even though the court's decision relied on the lack of any corroboration for Zurlo's statements.

Nine months later, shortly before trial, the prosecutor produced the paralegal interview notes in discovery to the defense. The defense lawyer then moved for reconsideration of the motion to dismiss the indictment. The court denied the motion for reconsideration.

At trial, the jury acquitted Zurlo of first-degree murder but convicted him of second-degree murder.[3] This appeal followed.

*The role of the prosecutor at grand jury under Alaska law*

Article I, section 8 of the Alaska Constitution provides, in pertinent part, that "[n]o person shall be held to answer for a capital, or otherwise infamous crime,

---

[3] AS 11.41.100(a)(1)(A) (murder in the first degree); AS 11.41.110(a)(1) (murder in the second degree).

unless on a presentment or indictment of a grand jury." The constitutional right to a grand jury indictment in a felony prosecution "ensures that a group of citizens will make an independent determination about the probability of the accused's guilt 'before the accused suffers any of the grave inconveniences which are apt to ensue upon the return of a felony indictment.'"[4] More than just a rubber stamp of the prosecution, the grand jury "plays a protective role by operat[ing] to control abuses by the government and protect[ing] the interests of the accused."[5]

The duty of a prosecutor to inform the grand jury of exculpatory evidence arises directly from the independence of the grand jury and the protective role it is intended to play in Alaska's criminal justice system. More than forty years ago, in *Frink v. State*, the Alaska Supreme Court reasoned that, unless the grand jury was made aware of evidence tending to negate the defendant's guilt, it could not be expected to exercise its powers to call additional witnesses and to inquire further into issues which it might deem significant.[6] The court therefore held that a prosecutor had an affirmative duty, under Alaska Criminal Rule 6(q), to present exculpatory evidence to the grand jury.[7] This duty is consistent with the American Bar Association's ethical standards for

---

[4]    *Cameron v. State*, 171 P.3d 1154, 1156 (Alaska 2007) (quoting *State v. Gieffels*, 554 P.2d 460, 465 (Alaska 1976)); *see also Wassillie v. State*, 411 P.3d 595, 608 (Alaska 2018)..

[5]    *Cameron*, 171 P.3d at 1156 (alteration in original) (citations and internal quotation marks omitted); *see also Preston v. State*, 615 P.2d 594, 602 (Alaska 1980) ("The grand jury functions as a 'shield' as well as a 'sword' of justice, and 'should operate to control abuses by the government and protect the interests of the accused.'" (quoting *United States v. Cox*, 342 F.2d 167, 186 n.1 (5th Cir. 1965) (Wisdom, J., concurring) and *Coleman v. State*, 553 P.2d 40, 47 (Alaska 1976))).

[6]    *Frink v. State*, 597 P.2d 154, 165-66 (Alaska 1979).

[7]    *Id.* at 164.

prosecutors[8] and with "the proper role of the district attorney in a criminal prosecution," which is to seek justice, not simply indictment or conviction.[9]

The *Frink* court also made clear, however, that the duty to present exculpatory evidence to the grand jury "does not turn the prosecutor into a defense attorney."[10] The prosecutor "does not have to develop evidence for the defendant and present every lead possibly favorable to the defendant."[11] As the supreme court explained in a later case, there is a difference between evidence that is exculpatory and evidence that is "merely inconsistent."[12]

---

[8]  *See id.* at 165 ("The prosecutor should disclose to the grand jury any evidence which he knows will tend to negate guilt." (quoting *ABA Standards Relating to the Prosecution Function and the Defense Function* § 3.6(b) (Approved Draft 1971))). The current ABA standards define the prosecutor's duty as follows:

> A prosecutor with personal knowledge of evidence that directly negates the guilt of a subject of the investigation should present or otherwise disclose that evidence to the grand jury. The prosecutor should relay to the grand jury any request by the subject or target of an investigation to testify before the grand jury, or present other non-frivolous evidence claimed to be exculpatory.

*ABA Criminal Justice Standards for the Prosecution Function* § 3-4.6(e) (4th ed. 2017).

[9]  *Frink*, 597 P.2d at 165.

[10]  *Id.* at 166.

[11]  *Id.*

[12]  *Preston v. State*, 615 P.2d 594, 602 (Alaska 1980); *see also Milligan v. State*, 286 P.3d 1065, 1071 (Alaska App. 2012) ("The mere fact of inconsistency does not automatically convert all such evidence into exculpatory material." (quoting *Preston*, 615 P.2d at 602)); *State v. McDonald*, 872 P.2d 627, 639 (Alaska App. 1994) (holding that evidence that "may well be exculpatory in the limited sense that it may be the kind of evidence skilled counsel might develop" does not necessarily "tend to negate [a defendant's] guilt in its own right").

Thus, this Court has previously held that evidence is considered "exculpatory" for purposes of a prosecutor's duty to disclose such evidence to the grand jury only if the evidence is "substantially favorable to the defendant."[13] And evidence is considered "substantially favorable to the defendant" only if it tends, in and of itself, to negate the defendant's guilt.[14] Moreover, the failure to present exculpatory evidence to the grand jury is generally rendered harmless where the strength of the evidence presented to the grand jury is more than enough to allow the grand jury to return a true bill.[15]

The prosecutor's duty to present exculpatory evidence is also informed by the prosecutor's duty of candor and fair dealing.[16] As the supreme court explained in *Preston v. State*, the purpose of the *Frink* rule is not to turn the grand jury proceeding

---

[13] *See, e.g.*, *Williams v. State*, 418 P.3d 870, 877-78 (Alaska App. 2018); *Shorthill v. State*, 354 P.3d 1093, 1114-15 (Alaska App. 2015); *Milligan*, 286 P.3d at 1071; *Cathey v. State*, 60 P.3d 192, 195 (Alaska App. 2002); *McDonald*, 872 P.2d at 639; *Lipscomb v. State*, 700 P.2d 1298, 1302 (Alaska App. 1985); *Tookak v. State*, 648 P.2d 1018, 1021 (Alaska App. 1982).

[14] *See Williams*, 418 P.3d at 877-78; *Milligan*, 286 P.3d at 1071; *Cathey*, 60 P.3d at 195; *McDonald*, 872 P.2d at 639.

[15] *See Lipscomb*, 700 P.2d at 1304 n.4 (noting that even if the prosecutor had introduced the exculpatory evidence, the other testimony and physical evidence "was more than enough for the grand jury to return a true bill"); *cf. Giacomazzi v. State*, 633 P.2d 218, 224 (Alaska 1981) (use of inadmissible hearsay at grand jury will not vitiate an indictment if other evidence was presented which justified the indictment).

[16] *See* Alaska R. Prof. Conduct 3.3 (requiring candor toward the tribunal); Alaska R. Prof. Conduct 3.4 (requiring fairness to opposing party and counsel); Alaska R. Prof. Conduct 3.8(d) (listing special responsibilities of a prosecutor including "timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense").

into "a mini-trial."[17]  Instead, it is simply to ensure that the evidence presented by the prosecutor is "reasonably complete and fair in the context of a grand jury proceeding."[18]

The requirement that the prosecutor's presentation of evidence at grand jury be "reasonably complete and fair" is universally recognized, even among jurisdictions that do not impose an affirmative duty on prosecutors to present exculpatory evidence to the grand jury.[19]  For example, Illinois courts do not recognize any duty to present exculpatory evidence to the grand jury, but they do recognize that "[t]he due process rights of a defendant may be violated if the prosecutor deliberately or intentionally misleads the grand jury, uses known perjured or false testimony, or presents other deceptive or inaccurate evidence."[20]

Other jurisdictions that recognize a limited duty to present exculpatory evidence to the grand jury have similarly cautioned prosecutors against misleading the grand jury with inaccurate or incomplete information.  As the Massachusetts Supreme Court explained in a recent case:

> A prosecutor is not required to present all possibly exculpatory evidence to a grand jury.  But a prosecutor cannot be permitted to subvert the integrity of grand jury

---

[17]  *Preston*, 615 P.2d at 602 (quoting *State v. Gieffels*, 554 P.2d 460, 465 (Alaska 1976)).

[18]  *Id.* at 603; *see also Frink v. State*, 597 P.2d 154, 166 (Alaska 1979) (concluding that prosecutor's presentation constituted "a reasonable and fair presentation" of relevant evidence).

[19]  *See ABA Criminal Justice Standards for the Prosecution Function* § 3-4.5 (4th ed. 2017).

[20]  *People v. DiVincenzo*, 700 N.E.2d 981, 991 (Ill. 1998), *abrogated on other grounds by People v. McDonald*, 77 N.E.3d 26 (Ill. 2016).

proceedings by selling the grand jury shoddy merchandise without appropriate disclaimers.[21]

The current American Bar Association Standards for the Prosecution Function likewise emphasize that "the prosecutor should respect the independence of the grand jury and should not preempt a function of the grand jury, mislead the grand jury, or abuse the processes of the grand jury."[22]

The requirement that the prosecutor's presentation of evidence at grand jury be "reasonably complete and fair" also provides the underpinning for criminal rules such as Alaska Criminal Rule 6(r)(4), which is directly at issue in this case. As already explained, Alaska Criminal Rule 6(r)(3) authorizes peace officers to testify at grand jury to the hearsay statements and observations of another peace officer involved in the investigation, even though such testimony would be inadmissible at trial. But Criminal Rule 6(r)(4) imposes significant limitations on this practice. This rule provides that:

> If the testimony presented by a peace officer under [Criminal Rule 6(r)(3)] is inaccurate because of intentional, grossly negligent, or negligent misstatements or omissions, then the court shall dismiss an indictment resulting from the testimony if the defendant shows that the inaccuracy prejudices substantial rights of the defendant.[23]

The underlying purpose of this provision is clear: Under Alaska law, prosecutors bear an affirmative duty to ensure that the hearsay testimony of peace officers is accurate and

---

[21] *Commonwealth v. Hall*, 147 N.E.3d 1078, 1093 (Mass. 2020) (citations and internal quotation marks omitted).

[22] *ABA Criminal Justice Standards for the Prosecution Function* § 3-4.5(a) (4th ed. 2017).

[23] Alaska R. Crim. P. 6(r)(4).

that the officer's testimony does not mislead the grand jury or distort the known evidence in the case.[24]

*The prosecutor in the current case violated his duty of candor and fair dealing and did not provide a reasonably complete and fair presentation to the grand jury*

Here, there is no question that the peace officer's testimony was both incomplete and misleading. The peace officer testified that Zurlo admitted to shooting Corcoran. But he did not testify to the remainder of Zurlo's statement — that Zurlo claimed to have shot Corcoran in self-defense because Corcoran threatened his life and appeared to be reaching for a gun. As a result, the grand jury was left with the erroneous impression that Zurlo had confessed to shooting Corcoran essentially for no reason.

The Massachusetts Supreme Court addressed a similar situation in *Commonwealth v. O'Dell*.[25] In that case, the defendant had given a statement to the police in which he admitted to being the driver of a van that was used as a getaway car following a robbery.[26] Although the defendant admitted to being in the van with the co-defendant who committed the robbery, he denied knowing both that the co-defendant

---

[24] *See Wassillie v. State*, 411 P.3d 595, 608 (Alaska 2018) (stating that "Alaska's atypically strict evidentiary standards for grand jury proceedings reflect the constitutional framers' concerns about prosecutors' control over what the grand jury hears"); *Cameron v. State*, 171 P.3d 1154, 1157-59 (Alaska 2007) (noting that the requirements of Alaska Criminal Rule 6 "would be empty if the prosecutor were not required to inform the grand jury of the existence of such [exculpatory] evidence").

[25] *Commonwealth v. O'Dell*, 466 N.E.2d 828, 830 (Mass. 1984).

[26] *Id.*

was going to commit a robbery and that the co-defendant had committed a robbery.[27] The defendant also admitted that the co-defendant had yelled "[l]et's get out of here" but he claimed that he thought the co-defendant had only done some shoplifting.[28]

At the grand jury, a detective testified to the defendant's statement, but he omitted any reference to the defendant's denial of involvement in, or knowledge of, the robbery.[29] The superior court dismissed the indictment based on those omissions.[30]

In affirming the dismissal, the Massachusetts Supreme Court noted that it considered the omissions to have been more than "a mere withholding of exculpatory evidence."[31] As the court explained, the presentation of the defendant's edited statement "tended to distort the meaning of that portion of the defendant's statement that was repeated to the grand jury and, in addition, strongly suggested, incorrectly, an admission of guilt by silence."[32] The court noted that, because it would be reasonable for a person who did not know about the robbery to disclaim knowledge of the robbery at the same time that he admitted having been the driver of the van, the grand jury was likely to treat the defendant's statement as a full confession of guilt when it was not one.[33] The court further concluded that this selective presentation of the defendant's statement impaired

---

[27] *Id.*

[28] *Id.*

[29] *Id.* at 828-29.

[30] *Id.*

[31] *Id.* at 830.

[32] *Id.*

[33] *Id.*

the integrity of the grand jury proceedings and required dismissal without prejudice of the indictment.[34]

The current case is remarkably similar to *O'Dell*. Here, the prosecutor was well aware that Zurlo claimed that he shot Corcoran because (according to Zurlo) Corcoran had threatened to kill or "end" Zurlo "here and now" while reaching behind his back for what Zurlo believed was a gun. The prosecutor was also well aware, from both Zurlo's statements and Vallier's corroborating statements in her pre-grand jury interview, that Corcoran had threatened to shoot Zurlo under very similar circumstances less than a week earlier, and that Corcoran was known to carry a gun in the back of his waistband.

In defending his decision not to present Zurlo's statements to the grand jury, the prosecutor argued that he was not required to present what he considered to be false statements by the defendant. But it was the grand jury that was tasked with determining the potential meaning and significance of these statements, not the prosecutor.[35] As a member of this Court has previously noted, the State "must not lose sight of the fact that it is the prosecutor who serves the grand jury and not the converse."[36]

---

[34] *Id.* at 830-31.

[35] *See Coleman v. State*, 553 P.2d 40, 52 (Alaska 1976) ("In order to determine whether other available evidence will explain away the charge, the grand jury had the right to know if the defendant had made any exculpatory statements to the police."); *Frink v. State*, 597 P.2d 154, 165 (Alaska 1979) (noting that the "grand jury cannot be expected to call for evidence of which it is kept ignorant" (quoting *Johnson v. Superior Court*, 539 P.2d 792, 794 (Cal. 1975) (en banc))).

[36] *Gaona v. State*, 630 P.2d 534, 539 (Alaska App. 1981) (Bryner, J., concurring); *see also* Alaska R. Crim. P. 6(i) (specifying that the prosecutor has a duty "to advise [the grand jury] of their duties"); *Cameron v. State*, 171 P.3d 1154, 1157-58 (emphasizing that the
(continued...)

Moreover, the flaw in the presentation of evidence to the grand jury goes much deeper than just a failure to introduce exculpatory statements. By selectively curating Zurlo's statements so that the grand jury heard only the portion that was inculpatory — *i.e.*, Zurlo's admission that he shot Corcoran — without hearing the exculpatory statements that provided the direct context for the inculpatory statements — *i.e.*, Zurlo's claim that he shot Corcoran *in self-defense* — the testifying officer actively misrepresented what Zurlo had said. And the prosecutor not only allowed this to occur but directly sanctioned the deception by rephrasing his own question to ensure that the jury did not hear about Corcoran's threats to Zurlo:

> *Prosecutor*: Okay. And why did he say that he shot [Corcoran]?
>
> *Harris*: He said it was just a reaction.
>
> *Prosecutor:* Okay. Did he state that he was threatened — well, did he say that he was physically assaulted, anything like that?
>
> *Harris*: No, he did not.

This exchange appears to have been intended to leave the grand jury with the impression not only that Zurlo was never physically attacked by Corcoran but also that Zurlo was never threatened by Corcoran and never claimed to have felt threatened by Corcoran.

The distinction between a prosecutor failing to introduce exculpatory evidence and a prosecutor actively misleading the grand jury to believe that such exculpatory evidence does not exist is illustrated by a series of New York appellate cases. In New York, prosecutors do not have an affirmative duty to present exculpatory

---

[36] (...continued)
safeguards provided through Criminal Rule 6 "help[] prevent the grand jury from becoming a mere rubber stamp for the prosecutor or an administrative arm of the district attorney's office" (citations and internal quotation marks omitted)).

evidence to the grand jury, but they are not permitted to present a defendant's statement in a way that is misleading. In *People v. Isla*, a New York appellate court strictly admonished the prosecutor for engaging in this type of curation:

> While the prosecutor usually has wide discretion in these matters and is not strictly required to present exculpatory evidence in seeking the Grand Jury's indictment[,] . . . it seems more than just a little unfair for the People's attorney, in this case, not to have disclosed the whole of defendant's confession. Merely having the officer testify that the defendant "said that he had shot a man the manager during an argument" is not enough. He should have quoted the rest of the sentence, i.e., that defendant had shot "*in self-defense.*" The Grand Jury was entitled to the full story so that it could make an independent decision that probable cause existed to support an indictment.[37]

As a result of *Isla*, New York courts have adopted a clear rule that when "a prosecutor introduces a defendant's inculpatory statement to the grand jury, he is obligated to introduce an exculpatory statement given during the course of the same interrogation which amplifies the inculpatory statement if it supports a justification defense."[38]

In the current case, Zurlo's defense attorney made clear that the prosecutor's actions had undermined the grand jury's ability to fulfill its protective role and make an independent decision regarding the probability of Zurlo's guilt. In his argument to the superior court, the attorney noted that this case involved more than just a failure to inform the grand jury of Zurlo's self-defense claim. Instead, the prosecution "through their witnesses affirmatively denied the existence of Zurlo's self-defense

---

[37] *People v. Isla*, 96 A.D.2d 789, 789 (N.Y. App. Div. 1983) (emphasis added) (citations omitted).

[38] *People v. Morel*, 131 A.D.3d 855, 860 (N.Y. App. Div. 2015); *People v. Falcon*, 204 A.D.2d 181, 181-82 (N.Y. App. Div. 1994).

claim." As the attorney pointed out, the result was that the grand jury was not only kept ignorant of the self-defense claim, but it was also effectively prevented from serving its constitutionally mandated role of protecting the interests of the accused and controlling abuses by the government.[39] The grand jury had no reason to inquire into whether there was additional evidence that would "explain away the charge" because it was specifically led to believe that no such evidence existed and that Zurlo had admitted to shooting Corcoran during an argument for essentially no reason.

In its order denying Zurlo's motion to dismiss the indictment, the superior court recognized that the prosecutor had failed in his duty to "fully and fairly" present the available evidence. The superior court also found that the prosecutor's pause and restatement of his question about whether Zurlo said that he felt threatened into a question about physical assault suggested that it was a "conscious decision" by the prosecutor not to ask a question that would have allowed the grand jury to hear the full story of what Zurlo said.

The superior court nevertheless denied the motion to dismiss the indictment under the reasoning that Zurlo had failed to prove that introducing the exculpatory statements "would almost surely have resulted in a failure to indict." As Judge Hanley explains in his concurrence, the "would almost surely have resulted in a failure to indict" language is derived primarily from this Court's unpublished cases and was originally intended to be used with regard to a prosecutor's failure to instruct the grand jury on an affirmative defense. It has never been applied by the supreme court or this Court to a

---

[39] *See Cameron*, 171 P.3d at 1156 ("The grand jury plays a protective role by 'operat[ing] to control abuses by the government and protect[ing] the interests of the accused.'" (quoting *Preston v. State*, 615 P.2d 594, 602 (Alaska 1980))); *see also Frink v. State*, 597 P.2d 154, 165 (1979) ("[T]he vital function [of the grand jury is] protection of the innocent against oppression and unjust prosecution." (quoting *State v. Gieffels*, 554 P.2d 460, 464 (Alaska 1976))).

prosecutor's failure to introduce exculpatory evidence to the grand jury. It is the wrong standard to apply in circumstances such as the present case where the prosecutor not only failed to introduce the defendant's exculpatory statements but also sanctioned — and indeed actively facilitated — the presentation of a highly misleading and distorted version of the defendant's statements to the grand jury.

A more appropriate standard to use in these circumstances is the one found in Criminal Rule 6(r)(4). That provision provides:

> If the testimony presented by a peace officer under [Criminal Rule 6(r)(3)] is inaccurate because of intentional, grossly negligent, or negligent misstatements or omissions, then the court shall dismiss an indictment resulting from the testimony if the defendant shows that the inaccuracy prejudices substantial rights of the defendant.[40]

Here, the prosecutor and the peace officer appear to have actively colluded to ensure that the grand jury never heard about Zurlo's self-defense claim. As a result of their actions, the grand jury was left with the false impression that Zurlo had confessed to killing Corcoran for essentially no reason. It is not surprising that the grand jury indicted on first-degree murder under these circumstances because there was no reason for the grand jury to think that this shooting was anything other than an intentional execution.

Typically, when we assess prejudice in the grand jury context, we look to whether the grand jury's decision to indict was substantially affected. Thus, for example, the use of inadmissible evidence before a grand jury will require dismissal of the defendant's indictment "only if the remaining, properly presented evidence was insufficient to support the return of an indictment or if the inadmissible evidence

---

[40] Alaska R. Crim. P. 6(r)(4).

appreciably affected the outcome of the grand jury's deliberations."[41]  In the context of false or inaccurate evidence, the supreme court has similarly held that "if the unintentional misstatement goes to a nonmaterial fact that would not substantially affect the grand jury's conclusion, it would not be reversible error."[42]

But these standards presume that the false evidence was presented to the grand jury "without knowledge or complicity" of the prosecutor.[43]  Here, in contrast, the prosecutor was directly complicit in the presentation of a highly misleading version of facts.  The prosecutor was aware that Zurlo claimed that Corcoran threatened to kill him and that Corcoran appeared to be reaching for a gun, and, as the superior court found, the prosecutor made a "conscious decision" to reframe his question to the testifying officer to ensure that the grand jury did not hear this material evidence.

By deliberately misleading the grand jury about the defendant's exculpatory statements, the prosecutor was actively subverting the integrity of the grand jury process and directly prejudicing the defendant's substantial rights.[44]  As the Massachusetts Supreme Court explained in *O'Dell*:

---

[41]  *State v. Green*, 810 P.2d 1023, 1027 (Alaska App. 1991); *see State v. McDonald*, 872 P.2d 627, 638 (Alaska App. 1994); *Stern v. State*, 827 P.2d 442, 445-46 (Alaska App. 1992); *see also Wassillie v. State*, 411 P.3d 595, 608-09 (Alaska 2018) ("An indictment based upon inadmissible evidence is considered invalid; but if sufficient admissible evidence was presented to the grand jury for it to indict, then the presentation of inadmissible evidence is harmless error.").

[42]  *McMahan v. State*, 617 P.2d 494, 500 (Alaska 1980) (quoting *State v. Keith*, 612 P.2d 977, 981 (Alaska 1980)).

[43]  *Miller v. State*, 629 P.2d 546, 547-48 (Alaska App. 1981); *McMahan*, 617 P.2d at 500.

[44]  *Cameron*, 171 P.3d at 1159 (emphasizing the importance of an independent grand jury that is able to fulfill its constitutionally mandated protective role).

Our affirmance of the dismissal of the indictment results from our conclusion that the integrity of the grand jury proceeding was impaired by an unfair and misleading presentation to the grand jury of a portion of a statement attributed to the defendant without revealing that an exculpatory portion of the purported statement had been excised. We do not announce a rule that would require prosecutors in all instances to bring exculpatory evidence to the attention of grand juries. We are satisfied in this case, however, that the withholding of a portion of the defendant's statement distorted the portion that was repeated to the grand jury in a way that so seriously tainted the presentation to that body that the indictment should not have been allowed to stand.[45]

We likewise find that the indictment in Zurlo's case was seriously tainted by the prosecutor's actions and the superior court therefore erred in failing to dismiss the indictment.

We acknowledge the temptation to downplay the egregiousness of what occurred here because, when all was said and done, the petit jury convicted Zurlo of second-degree murder (although he was acquitted of first-degree murder). Indeed, some jurisdictions have held that deficiencies in the grand jury process are nevertheless rendered moot following the defendant's conviction at trial.[46]

---

[45]   *Commonwealth v. O'Dell*, 466 N.E.2d 828, 829 (Mass. 1984).

[46]   *See United States v. Mechanik*, 475 U.S. 66, 72-73 (1986) (holding under federal law that defect in grand jury process was rendered moot by defendant's conviction following error-free trial); *People v. Isla*, 96 A.D.2d 789, 789-90 (N.Y. App. Div. 1983) (admonishing prosecutor for presenting misleading version of defendant's statements but ultimately concluding that dismissal was not required "since defendant was able to present his defense of self-defense and justification at trial"). *But see Wassillie*, 411 P.3d at 608-11 (rejecting *Mechanik* as a matter of state constitutional law).

But Alaska law is clear that the grand jury indictment is the "foundation" underlying a criminal prosecution in this state: "If the indictment is seriously flawed, the conviction cannot stand."[47] As the supreme court explained in *Adams v. State*, "If we were to find that a trial could validate an otherwise invalid indictment, the right to indictment by a grand jury would become a nullity and the grand jury would cease to operate as a check upon the district attorney's power to initiate prosecution."[48] It is likely true that a defendant's constitutional right to indictment under the Alaska Constitution would ultimately become meaningless if prosecutors were permitted to manipulate and misrepresent evidence in the manner that occurred here.

Accordingly, because the prosecutor violated his duty to present a "reasonably complete and fair" presentation to the grand jury and because the prosecutor's actions subverted the integrity of the grand jury proceeding, we reverse Zurlo's conviction and remand this case to the superior court for further proceedings.[49]

*Conclusion*

The judgment of the superior court is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.

---

[47] *Taggard v. State*, 500 P.2d 238, 243 (Alaska 1972).

[48] *Adams v. State*, 598 P.2d 503, 510 (Alaska 1979); *see also Wassillie*, 411 P.3d at 612 ("Only by reversing a conviction based on an invalid indictment can we safeguard the grand jury's role as a check on overzealous prosecution.").

[49] Because we are reversing Zurlo's conviction, we do not reach his other claims on appeal.

Judge HANLEY, concurring.

In *Frink v. State*, the Alaska Supreme Court held that the prosecutor in a felony case is required to present to the grand jury information that reasonably tends to negate guilt and to present information in a "reasonable and fair" manner.[1] The State fell far short of these duties in its grand jury presentation of evidence against Zurlo. The supreme court has also held that "[t]he indictment is the foundation underlying a criminal prosecution. If the indictment is seriously flawed, the conviction cannot stand."[2] Because the grand jury presentation and resulting indictment were seriously flawed, I agree with the majority that Zurlo's conviction should not stand.

I write separately only to express concern regarding how some of the protections of *Frink* appear to have been eroded in our case law over time.

When the *Frink* court imposed the duty on the prosecutor to present exculpatory evidence, it explained that "evidence tending to refute" guilt must be presented.[3] To support its conclusion, the court cited with approval the California Supreme Court's holding that a prosecutor must present evidence "reasonably tending to negate guilt."[4] It further cited the American Bar Association's standard that if evidence that "tend[s] to negate guilt" is known to the prosecutor, it should be disclosed to the grand jury.[5] It ultimately concluded that the prosecutor's presentation in *Frink* was

---

[1]  *Frink v. State*, 597 P.2d 154, 165-66 (Alaska 1979).

[2]  *Taggard v. State*, 500 P.2d 238, 243 (Alaska 1972).

[3]  *Frink*, 597 P.2d at 165.

[4]  *Id.* (quoting *Johnson v. Superior Court*, 539 P.2d 792, 796 (Cal. 1975) (en banc)).

[5]  *Id.* at 165 (quoting *ABA Standards Relating to the Prosecution Function and the Defense Function* § 3.6(b) (Approved Draft 1971)).

"reasonable and fair" and did not violate the State's obligation.[6] The following year, in *Preston v. State*[7] and *Mallott v. State*,[8] the court reiterated its adoption of the "reasonably tending to negate guilt" standard and that the State's presentation must be "reasonably complete and fair."[9]

Since *Frink*, this Court has changed the "reasonably tending to negate guilt" standard so that the exculpatory evidence obligation is not triggered unless the information available to the prosecutor would be "substantially favorable" to the defendant.[10] "Substantially favorable" evidence is defined as evidence that "tends, in and of itself, to negate the defendant's guilt."[11]

This shift in definition first appeared in a 1982 case, *Tookak v. State*.[12] In *Tookak*, this Court justified the shift in standard with citations to two Alaska Supreme Court cases: *McMahan v. State* and *State v. Keith*.[13] But neither of these cases actually

_____

[6] *Id.* at 166.

[7] *Preston v. State*, 615 P.2d 594, 602-03 (Alaska 1980).

[8] *Mallott v. State*, 608 P.2d 737, 743-44 (Alaska 1980).

[9] *Preston*, 615 P.2d at 602-03.

[10] *Tookak v. State*, 648 P.2d 1018, 1021 (Alaska App. 1982); *see, e.g.*, *Williams v. State*, 418 P.3d 870, 877 (Alaska App. 2018); *Shorthill v. State*, 354 P.3d 1093, 1114-15 (Alaska App. 2015); *Cathey v. State*, 60 P.3d 192, 195 (Alaska App. 2002); *Hughes v. State*, 56 P.3d 1088, 1090 (Alaska App. 2002); *State v. McDonald*, 872 P.2d 627, 639 (Alaska App. 1994); *Sheldon v. State*, 796 P.2d 831, 838 (Alaska App. 1990); *York v. State*, 757 P.2d 68, 73 (Alaska App. 1988).

[11] *Williams*, 418 P.3d at 877 (quoting *Cathey*, 60 P.3d at 195); *McDonald*, 872 P.2d 639 (quoting *York*, 757 P.2d at 73).

[12] *Tookak*, 648 P.2d at 1021.

[13] *Id.* (citing *McMahan v. State*, 617 P.2d 494, 500 (Alaska 1980) and *Keith v. State*, 612

(continued...)

involved a prosecutor's duty to present exculpatory evidence. Instead, they involved a different defect in a grand jury presentation: the unintentional introduction of false or inaccurate testimony.[14] In both cases, the supreme court held that "if the unintentional misstatement goes to a nonmaterial fact that would not substantially affect the grand jury's conclusion, it would not be reversible error."[15] Relying on these cases, this Court in *Tookak* reasoned that a prosecutor's failure to introduce exculpatory evidence would likewise be harmless unless the evidence was of a nature that its introduction would "substantially affect" the grand jury's conclusion. This Court therefore changed the definition of "exculpatory evidence" in the grand jury context from evidence "reasonably tending to negate guilt" to evidence that is "substantially favorable" to the defense.[16]

However, the problem with introducing a harmlessness standard into the definition of exculpatory evidence is that the focus is no longer on the prosecutor's affirmative duty to present evidence tending to negate guilt. Instead, the focus is on the practical effects that failure to comply with that duty might cause. This is perhaps fine from an appellate review standpoint, but it is not necessarily how a prosecutor should be thinking about his or her duty in the first instance. In my view, it would have been better to retain the "reasonably tending to negate guilt" standard used in the Alaska Supreme

---

[13]  (...continued)
P.2d 977, 981 (Alaska 1980)).

[14]  *See McMahan*, 617 P.2d at 499-500; *Keith*, 612 P.2d at 981; *see also Miller v. State*, 629 P.2d 546, 547-48 (Alaska App. 1981) (describing the holdings of *Keith* and *McMahan* as applying to situations where "false evidence is presented to the grand jury without knowledge or complicity of the state and is immaterial").

[15]  *McMahan*, 617 P.2d at 500 (quoting *Keith*, 612 P.2d at 981).

[16]  *Tookak*, 648 P.2d at 1021. In *Tookak*, this Court also cited *Mallott v. State*, 608 P.2d 737, 743-44 (Alaska 1981), which used the "reasonably tending to negate guilt" standard employed in other Alaska Supreme Court cases.

Court cases to define the scope of a prosecutor's duty and to then apply a *separate* harmlessness analysis for when a failure to comply with that duty requires dismissal of an indictment. This would have ensured that a prosecutor's duty to present exculpatory evidence under *Frink* did not become subsumed into a harmlessness analysis, thereby providing clearer direction to prosecutors regarding their duty under *Frink*.

Further compounding the problem, some unpublished Court of Appeals cases have imposed a standard that, if a prosecutor fails to instruct a grand jury on self-defense, the indictment will not be dismissed unless the grand jury "almost surely" would have failed to indict if it had been instructed. I believe this standard has been adopted and applied imprecisely, contrary to the intent of *Frink*.

The language "would almost surely have resulted in a failure to indict" is from a 1983 Alaska Supreme Court case, *Grant v. State*.[17] But it is originally derived from a New York trial decision, *People v. Karassik*, which used the language to differentiate between the typical situation in which a prosecutor is not required to instruct the grand jury on an affirmative defense (such as entrapment) and those rare situations where the evidence is such that the prosecutor *is* required to instruct the grand jury on an affirmative defense because instruction on the affirmative defense "would almost surely have resulted in a failure to indict."[18]

It is noteworthy that the language "would almost surely have resulted in a failure to indict" does not appear in any other New York cases. Nor is it used again by the Alaska Supreme Court. But it is used in a number of unpublished Court of Appeals decisions. Some of these decisions involve affirmative defenses such as diminished capacity, but many of them also involve self-defense, which is not an affirmative defense

---

[17]  *Grant v. State*, 621 P.2d 1338, 1341 (Alaska 1981).

[18]  *Id.* (quoting *People v. Karassik*, 396 N.Y.S.2d 765, 771 (N.Y. Sup. Ct. 1977)).

under Alaska law.[19]  For example, in *Delolli v. State*, this Court held that a prosecutor is not required to instruct the grand jury "on a potential defense (such as self-defense) unless the evidence supporting the defense is so strong that had the instruction been given[,] . . . the grand jurors 'almost surely' would have failed to indict the defendant."[20]

My concern with the "almost surely" language is three-fold.  First, it is being misused by trial courts to define the scope of a prosecutor's duty to present exculpatory evidence when it was intended to apply only to a prosecutor's duty to instruct on an affirmative defense.  Second, the "would almost surely have resulted in a failure to indict" standard appears to be a higher standard than the "substantially affects" harmlessness standard used to evaluate other types of grand jury defects.  Third, application of such a standard to a prosecutor's duty to present exculpatory evidence represents a significant departure from the "reasonably tending to negate guilt" standard that the *Frink* court established.

I conclude that, over time, the standards intended to give strength and practical effect to *Frink*'s holding have failed to do so.  The present case demonstrates this failure.  On appeal, Zurlo asserts that the prosecutor failed to present four exculpatory statements to the grand jury:  (1) that a week before the shooting Corcoran threatened to kill Zurlo the next time he complained about Corcoran entering Zurlo's bedroom unannounced; (2) that Zurlo knew that Corcoran possessed a handgun (although Zurlo had not seen it); (3) that Corcoran reached behind his back and

---

[19]   *Compare Wilkins v. State*, 2003 WL 22017306, at *2 (Alaska App. Aug. 27, 2003) (unpublished) (diminished capacity) *with Barclay v. State*, 2017 WL 1200905, at *2 (Alaska App. Mar. 29, 2017) (unpublished) (self-defense), *Pitt v. State*, 1997 WL 796503, at *2 (Alaska App. Dec. 24, 1997) (unpublished) (self-defense), *and Smith v. State*, 1995 WL 17221231, at *2 (Alaska App. Aug. 9, 1995) (unpublished) (self-defense).

[20]   *Delolli v. State*, 2003 WL 22143282, at *4 (Alaska App. Sept. 17, 2003) (unpublished) (quoting *Grant*, 621 P.2d at 1341).

threatened to kill or "end" Zurlo "here and now"; and (4) that Zurlo believed Corcoran was reaching behind his back for a weapon, prompting him to pick up his gun and shoot Corcoran.

I believe that these statements, obviously indicating Zurlo's belief that he acted in self-defense, clearly constitute evidence "reasonably tending to negate guilt"— which I believe is the standard the *Frink* court requires prosecutors to employ.

The *Frink* court reasoned that a vital function of the grand jury is to protect innocent people from unjust prosecutions.[21]  Criminal Rule 6(q) empowers a grand jury to do this by ordering exculpatory evidence to be produced and requiring the prosecutor to subpoena witnesses if it "has reason to believe that other available evidence will explain away the charge."  That investigative authority, however, is hollow unless the grand jury is made aware of evidence that might tend to refute guilt.  As the *Frink* court noted, "[t]he grand jury cannot be expected to call for evidence of which it is kept ignorant,"[22] as was the case with Zurlo's grand jury.  A grand jury is a group of citizens tasked with making an independent determination about the probability of the accused's guilt before the serious consequences of a felony prosecution are imposed upon the accused.[23]  It cannot do so when blindfolded.

To restore *Frink*'s promise to its intended vitality, I believe courts should require prosecutors to comply with the standards announced by the supreme court:  to present information to grand juries that reasonably tends to negate guilt and to present evidence in a reasonable and fair manner.  If these duties are not honored, as occurred here, trial courts should strike the tainted indictments and require prosecutors to seek a

---

[21]  *Frink v. State*, 597 P.2d 154, 165 (Alaska 1979).

[22]  *Id.* (quoting *Johnson v. Superior Court*, 539 P.2d 792, 794 (Cal. 1975) (en banc)).

[23]  *Cameron v. State*, 171 P.3d 1154, 1156 (Alaska 2007).

valid indictment. If these standards are not enforced, the distorted presentation of evidence to grand juries and obvious non-compliance with the duty to present exculpatory evidence will produce no practical incentive for prosecutors to comply nor any protection for defendants. When this happens, the fear that the grand jury becomes nothing more than an "administrative arm" of the State becomes reality.[24]

---

[24] *State v. Gieffels*, 554 P.2d 460, 465 (Alaska 1976).